IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-02178-RBJ

STEPHEN BRETT RYALS,

     Plaintiff,

v.

CITY OF ENGLEWOOD,

     Defendant.

---

## Findings of Fact, Conclusions of Law and Order of Judgment

---

     This case was tried to the Court from July 22 to 25, 2013.  Plaintiff Stephen Brett Ryals challenges the constitutionality of the City of Englewood's Ordinance 34, which restricts where certain sex offenders—including Mr. Ryals—may reside.  Mr. Ryals brings five claims under three theories, arguing that the ordinance (1) is preempted by state sex offender regulations, (2) retroactively and punitively changes the legal consequences of his original conviction, and (3) deprives him of his liberty without due process of law.  The Court finds that the Englewood ordinance in its present form is preempted by Colorado state law.

### FACTS AND CASE HISTORY

#### A.  Mr. Ryals' Sex Offense and Citation under Ordinance 34.

     In 2001 Mr. Ryals had a consensual sexual relationship with a high school student who was ten years younger than him and who was a soccer player he coached.  As a result of the unlawful relationship, Mr. Ryals pleaded guilty to criminal attempt to commit sexual assault on a child by one in a position of trust.  In July 2001, he was sentenced to seven years of probation.

1

Mr. Ryals later violated the probation terms by continuing to see his victim, and he was sentenced to two years in prison.

Mr. Ryals was released on April 13, 2003 and later discharged from parole on October 13, 2004. Mr. Ryals is required under the Colorado Sex Offender Registration Act ("CSORA") to register as a sex offender for a decade after his release, and has complied with those registration requirements. He will be eligible to petition the court of his original conviction to discontinue registration in October 2014. Other than registration, he is no longer supervised under any state requirement related to his sex offense.

In 2012 Mr. Ryals began to search for houses with his wife, Erin Schoepke.[1] He began his search in the City and County of Denver area but eventually expanded the search to the northern part of the City of Englewood which borders Denver. At that time, Mr. Ryals and Ms. Schoepke were living together in Denver in a house owned by Ms. Schoepke. On April 3, 2012 Mr. Ryals purchased a house within the Englewood city limits.

In anticipation of his move to Englewood, Mr. Ryals deregistered as a sex offender in the Denver. On April 30, 2012, Mr. Ryals telephoned the Englewood Police Department and spoke with Detective Janellee Ball about the process of registering as a sex offender at his new residence. Detective Ball informed him that he could not live in Englewood because of his felony sex offense, apparently without inquiring about his specific street address. Nevertheless, Mr. Ryals reported to the police department on the next day to register at that residence. Upon registering on May 1, 2012, Mr. Ryals was cited for violating Ordinance 34, an ordinance governing sex-offender residency restrictions that was adopted by the City of Englewood in

---

[1] Mr. Ryals and Ms. Schoepke both testified that they consider themselves and hold themselves out to be husband and wife at common law. Because the Court does not reach the question of Mr. Ryals' fundamental right to live with his spouse, any dispute over whether Mr. Ryals and Ms. Schoepke are in fact married at common law is immaterial.

2006.  The criminal case based on that citation has been stayed pending this action deciding the validity of the ordinance.  Mr. Ryals has remained living in his Englewood home.

### B.  City of Englewood Ordinance 34.

In July 2006 the City of Englewood received notice that the Colorado Board of Parole planned to place a "sexually violent predator" at an extended-stay hotel in the City that was within a block of a daycare center.[2]  This individual had originally been scheduled to be placed in Greenwood Village, a neighboring municipality, but Greenwood Village had promptly considered and on July 17, 2006 adopted a residency restriction that effectively put that municipality off limits for the placement of registered sex offenders.  Alarmed about the prospect of a sexually violent predator residing near children, City officials immediately began to consider enacting restrictions similar to those which had successfully kept the sexually violent predator out of Greenwood Village.

On July 18, 2006 the Englewood City Attorney provided the Mayor and City Council with a copy of the Greenwood Village ordinance and other materials on the subject.  Exhibit 3.  The Council discussed a residency restriction ordinance at a study session in August 2006, and it was first read and discussed as an emergency ordinance at a public session on September 5, 2006.  The ordinance was read again on September 18, 2006 and passed unanimously without further discussion.  *See* Englewood, Colo., Code of Ordinances 06-34, §§ 7-3-1 to -5 [hereinafter Englewood Code].  Exhibit 1.  Because the ordinance was passed as an emergency ordinance, no further publication was required as with a conventional ordinance.

---

[2] A "sexually violent predator" is an adult who was convicted after July 1, 1999 of certain sexual offenses <u>and</u> whose victim was a stranger or a person with whom the offender promoted a relationship for the purpose of sexual victimization <u>and</u> who, based on an approved risk assessment, is deemed likely to commit one of the listed sexual offenses again.  A court must make specific findings of fact and enter an order concerning whether the individual is a "sexually violent predator."  *See* C.R.S. § 18-3-414.5.  Mr. Ryals is not a "sexually violent predator."  Ultimately parole for this sexually violent predator was revoked, and he was not placed in Englewood

The City Council, in enacting the ordinance, made findings that sexual predators "present an extreme threat to the public safety" and "have a high rate of recidivism, making the cost of sex offender victimization to society at large extremely high." *Id.* § 7-3-1. "Removing such offenders from regular proximity to places where children are located and limiting the frequency of contact is likely to reduce the risk of an offense." *Id.* The Council declared its intent "to serve the City's compelling interest to promote, protect and improve the public health, safety and welfare by creating areas, around locations where children regularly congregate in concentrated numbers, where sexual predators and specified sexual offenders are prohibited from establishing temporary or permanent residence." *Id.*

The ordinance restricts the residency of two groups of sex offenders: (1) sexually violent predators as defined in C.R.S. § 18-3-414.5, and (2) certain sex offenders required to register under the CSORA, including those "convicted of a felony for an offense requiring registration," those with "multiple convictions for offenses requiring registration," and those "whose offense(s) requiring registration involved multiple victims." Englewood Code § 7-3-3. The ordinance makes it unlawful for these sex offenders

> to establish a permanent residence or temporary residence within two thousand feet (2,000') of any school, park, or playground or within one thousand feet (1,000') of any licensed day care center, recreation center or swimming pool (other than pools located at private, single-family residences), or any property located adjacent to any designated public or private school bus stop, walk-to-school route, or recreational trail.

*Id.*

Section 7-3-4 provides exceptions, including a "grandfather clause" for those who "established the permanent or temporary residence prior to the effective date of [the ordinance]" unless that person committed his or her offense after that effective date. Mr. Ryals, as a

registered felony sex offender, falls within the ambit of the ordinance and does not qualify for any of its exceptions.[3]

The Englewood Police Department, through the efforts of Detective Ball and Detective Edward J. Disner, has enforced Ordinance 34 since its adoption in 2006.  During trial the City presented a map showing the parts of the City that are off limits under Ordinance 34 as well as a list of residence addresses that are located in parts of the City that are unrestricted.  Exhibit 7.  The result, according to the City, is that 209 addresses within the City are not restricted, of which 126 addresses are residential.  However, according to Peter Wagner, plaintiff's geographic information systems and mapping expert, the correct number of parcels available to sex offenders is 55 unrestricted parcels out of 11,314 parcels total in the City.  Either way approximately 99% of the City is off-limits to most sex offenders.

These numbers also do not take into account whether any of the 126 or 55 unrestricted locations are actually available for sale or rent.  The Englewood Police Department gives out a map visually depicting the restricted areas, but for privacy reasons it does not provide the list that it developed in 2008 of the 126 residential addresses it suggests are unrestricted.  A sex offender covered by the ordinance therefore must first find an available house for rent or sale in the very limited unshaded areas on the map of Englewood and then call the police department to verify that the address is in fact unrestricted.  The police department handout provided to sex offenders warns that "[i]f you choose to contact the occupant who lives in a non shaded area not posted for rent/sale, you may be contacted by police, and could potentially be charged with trespassing." Exhibit 6.

---

[3] If Mr. Ryals successfully petitions the court when he is eligible in October 2014 or thereafter to be released from the registration requirement, he would no longer be subject to the restrictions in Ordinance 34.

Detective Ball testified that to ensure a "fair" process that is not otherwise provided for in the statute, the police department practices a "courtesy registration period" of two weeks from the date that the sex offender subject to Ordinance 34 appears.  During this courtesy period, the sex offender is not cited for violating the ordinance and has the three choices: (1) find residency in Englewood outside the restricted areas, (2) find residency outside Englewood, or (3) update his or her registration at the end of the courtesy period to the restricted residence and be cited.[4] As discussed later in this order, there is a fourth "option" -- "going underground" by simply not registering and living illegally either in Englewood or elsewhere.

The criminal citation for the ordinance can result in up to 360 days in jail and $1,000 fine.  Detective Ball testified that the first of the three recognized options has never occurred— no one in the seven-year history of the ordinance has ever first attempted to register at a restricted address in Englewood and then been able to find residence in the City that does not violate Ordinance 34.  The vast majority of sex offenders facing this criminal sanction have opted for the second "choice" and relocated to another city.  Only two people, including Mr. Ryals, have taken the third option and stayed at their selected residence despite a citation under Ordinance 34.[5]

The Court finds that as a practical matter this ordinance in its present form bans individuals falling within its terms, meaning anyone convicted of a felony sex offense of any kind and certain misdemeanor sex offenses, from living in the City of Englewood so long as they are required to register as a sex offender under Colorado law.  The tiny part of Englewood that falls outside the concentric circles marking 2000 feet or 1000 feet, as the case may be, from

---

[4] Detective Ball did not provide the courtesy two-week registration period to Mr. Ryals because she noted that he had already purchased his home and had shown his intent to remain there.
[5] Detective Ball was unaware of the disposition of the other citation and whether it was prosecuted or stayed as in Mr. Ryals's case.

schools, parks, playgrounds, day care centers, recreation centers, public pools, bus stops, walk-to school routes, and recreational trails leaves essentially no place for such offenders to live for all intents and purposes.  The detectives who enforce the ordinance appear to agree. For example, in a case report concerning another offender dated September 10, 2012, Detective Disner wrote, "I advised Leslie that his conviction made him ineligible to live within the City of Englewood." Ex. 11.  This is consistent with Mr. Ryals' testimony, which the Court finds to be credible, that Det. Ball told him that he could not live in the City of Englewood without knowing the address of his house.

### C.  <u>Relevant State Sex Offender Regulations</u>.

The state of Colorado maintains a network of statutes and regulations that govern sex offender supervision and management.  As relevant to this Court's analysis, the network comes primarily in essentially three facets: (1) evaluation, treatment, and management by the Sex Offender Management Board ("SOMB"), C.R.S. §§ 16-11.7-101 to -109; (2) registration of sex offenders under the CSORA, *id*. §§ 16-22-101 to -115; and (3) supervision and monitoring by the state parole board for sex offenders under supervised release as well as those subject to the Colorado Sex Offender Lifetime Supervision Act of 1998, C.R.S. §§ 18-1.3-1001 to -1012.

In 1992, the Colorado General Assembly enacted Article 11.7, governing a standardized treatment program for sex offenders.  *See* C.R.S. §§ 16-11.7-101 to -109.  In doing so, the General Assembly made the finding that, "to protect the public and to work toward the elimination of sexual offenses, it is necessary to comprehensively evaluate, identify, treat, manage, and monitor adult sex offenders who are subject to the supervision of the criminal justice system . . . . " *Id.* § 16-11.7-101(1).  Therefore, the legislature deemed it "necessary to

create a program that establishes evidence-based standards for the evaluation, identification, treatment, management, and monitoring of adult sex offenders . . . at each stage of the criminal . . . justice system to prevent offenders from reoffending and enhance the protection of victims and potential victims." *Id.* § 16-11.7-101(2).

Article 11.7 therefore created the Sex Offender Management Board ("SOMB"), tasked with implementing the standardized treatment program. *Id.* § 16-11.7-103(4). Cathy Rodriguez, the Adult Standard and Community Notification Coordinator for the SOMB, testified at the trial about the duties of the SOMB. As part of its statutory mandate, the SOMB has published and continued to revise a report titled "Standards and Guidelines for the Treatment, Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offender." *See id.* § 16-11.7-103(4)(b).

The standards and guidelines have mostly been implemented by the legislature, but as dictated by §16-11.7-103(4)(b), they are to be used only in the treatment of those offenders "who are placed on probation, incarcerated with the department of corrections, placed on parole, or placed in community corrections." The only residency-related guideline provides that, for any supervised sex offender, "[a]ny change of residence must receive prior approval by the supervising officer and those with whom the offender resides must know that they are a sex offender." Standard & Guidelines, § 5.620(K).

Article 11.7, however, does provide SOMB with the role to "research, analyze, and make recommendations that reflect best practices for living arrangements for and the location of adult sex offenders within the community, including but not limited to shared living arrangements." *Id.* § 16-11.7-103(4)(g). The SOMB is charged with "consider[ing] the safety issues raised by the location of sex offender residences, especially in proximity to public or private schools and

child care facilities, and public notification of the location of sex offender residences." *Id.* The SOMB is also charged with adopting and revising guidelines "regarding the living arrangements and location of adult sex offenders and adult sex offender housing." *Id.*

In March 2004, at this specific request of the Colorado legislature, the SOMB published a "Report on Safety Issues Raised by Living Arrangements for and Location of Sex Offenders in the Community" for Colorado's Judicial Committees. Exhibit 20. Based on the SOMB's research, the Report recommended against residency restrictions as a method to deter re-offense or to control recidivism. *Id.* at 37. In June 2009, the SOMB also published a White Paper on the Use of Residence Restrictions as a Sex Offender Management Strategy, reaffirming its previous position that residency restrictions are counterproductive to the goal of community safety. Exhibit 22. The SOMB published a second White Paper on Adult Sex Offender Housing in November 2011. Exhibit 39.

These position papers are not law in Colorado, but they are distributed to the legislature and other interested parties around the state. Furthermore, the General Assembly has declared that "[a]s a body, the [SOMB] is one of Colorado's most important resources on the treatment and management of adult sex offenders and juveniles who have committed sexual offenses," and that its "research and analysis of treatment standards and programs, as well as empirical evidence collected and compiled by the board with respect to the treatment outcomes of adult sex offenders and juveniles who have committed sexual offenses, is vital to inform the decisions of policymakers." C.R.S. § 16-11.7-109(1)(a).

As to the second part of existing state regulations, sex offender registration in Colorado is governed by the CSORA. C.R.S. §§ 16-22-101 to -115. The CSORA was enacted in 2002 and requires that all adult sex offenders register with the Colorado Bureau of Investigation. *Id.* §§

16-22-103, -108.  The CSORA also provides the procedures by which the Bureau is to maintain a statewide sex offender registry that is available to the public.  *Id.* § 16-22-110.  After a certain number of years as designated in § 16-22-113, the sex offender may petition the court that issued the order of judgment for the conviction to discontinue his requirement for registration.

Lastly, Colorado has regulations in place for the supervision of a sex offender, both through its parole and probation efforts, as well as the Lifetime Supervision Act.  *See, e.g.*, §§ 17-22.5-102.5; § 18-1.3-204.  The only state statute directly governing sex offender residency is § 17-22.5-403 which, both in subsections (6) and (8), requires that for sex offenders who are granted parole, "the division of adult parole shall provide parole supervision and assistance in securing employment, housing, and such other services as may effect the successful reintegration of such offender into the community while recognizing the need for public safety."  The Lifetime Supervision Act additionally provides sentencing, parole, and subsequent supervision, including indeterminate sentencing and lifetime probation, for cases involving more serious sex offenses.  *Id.* §§ 18-1.3-1001 to -1012.

To date, Colorado's statutes and regulations on sex offender management do not contain a provision limiting sex offender residency, despite one attempt in 2006 to adopt a statewide restriction.  On January 13, 2006, a house bill proposing regulation and restriction of the residency of sex offenders was considered by the House Judiciary Committee.  *See* H.R. 06-1089, 66th General Assembly, 2d Reg. Sess. (Colo. 2006).  The bill proposed adding a new section at C.R.S. § 18-3-417 compelling sex offenders to "not knowingly reside or work within one thousand five hundred feet of the property on which a public school, nonpublic school, licensed child care center . . . or playground is located."  *Id.*  Violation of the proposed section would be a class 1 misdemeanor.  *Id.*  Ultimately, House Bill 1089 was postponed indefinitely on

10

a 7 to 4 vote in the committee on February 2, 2006.  *Id.*  It does not appear from the record in this case that similar measures have been considered in subsequent sessions of the General Assembly.

## CONCLUSIONS OF LAW

Plaintiff asserts five claims for relief seeking declaratory and injunctive relief for alleged violations of the Colorado and United States Constitutions.  Mr. Ryals's first claim alleges that Englewood's residency restriction is unconstitutional under Article XX, Section 6 of the Colorado Constitution because it is preempted by existing state law.  Mr. Ryals's second and third claims for relief allege violations of the ex post facto clauses in the United States and Colorado Constitutions.  His fourth and fifth claims for relief allege deprivations of his liberty without due process of law under both Constitutions.  Because the Court finds that the Englewood ordinance is preempted by Colorado state law, it does not reach his other constitutional claims under the ex post facto or substantive due process clauses.

Article XX, section 6 of the Colorado Constitution grants municipalities, such as the City of Englewood, "home-rule" authority to create or amend charters to govern local and municipal matters.  Colo. Const. art XX, § 6.  "This constitutional provision allows a municipality to legislate in areas of local concern that the state General Assembly traditionally legislated in, thereby limiting the authority of the state legislature with respect to local and municipal affairs in home-rule cities."  *Webb v. City of Black Hawk*, 295 P.3d 480, 486 (Colo. 2013).  Where an issue is solely of local concern, a home-rule city has plenary authority and is not inferior in authority to the Colorado General Assembly.  *Id.*  Consequently, on a preemption challenge, this Court must first determine whether the matter being regulated is "a matter of local, state, or mixed local and statewide concern."  *City of Commerce City v. State*, 40 P.3d 1273, 1279 (Colo. 2002).

"With regard to matters of statewide concern, the state legislature has supreme authority and home-rule cities have no power to act unless authorized by the constitution or by state statute." *Id.* However, if the matter is one of local or mixed concern, the second question for the Court is, "do the state statutes conflict with the [City's] local ordinances or charters." *Id.* If a home-rule ordinance conflicts with state law in a matter of mixed concern, state law supersedes the home-rule provision. *Id.*

The City argues that the subject matter here is a matter of mixed state and local concern, and that there is no conflict between the ordinance and existing state law. Mr. Ryals contends that the matter is one of statewide concern, which results in automatic preemption unless the ordinance was otherwise authorized by the constitution or by state statute. Alternatively, Mr. Ryals contends that if the Court finds that it is a matter of mixed state and local concern, the ordinance does conflict with state law.

### A.  Local, Statewide or Mixed State and Local Concern?

The determination whether a regulatory matter is of local, statewide or mixed concern is made on an *ad hoc* basis. *City of Commerce City,* 40 P.3d at 1280. "Because the categories do not reflect factually perfect descriptions of the relevant interests of the state and local governments, categorizing a particular matter constitutes a legal conclusion involving considerations of both fact and policy." *Webb*, 295 P.3d at 486.

Colorado courts have considered several general factors to assist them in "weighing the importance of the state interests with the importance of the local interests," including:

(1) the need for statewide uniformity of regulation;

(2) the impact of municipal regulation on persons living outside the municipal limits;

(3) historical considerations, specifically whether the matter is one traditionally governed by state or by local government; and

(4) whether the Colorado Constitution specifically commits the matter to state or local regulation.

*City of Commerce City,* 40 P.3d at 1280.  "All of these factors are 'directed toward weighing the respective state and local interests implicated by the law,' a process that lends itself to flexibility and consideration of numerous criteria."  *City of Northglenn v. Ibarra*, 62 P.3d 151, 156 (Colo. 2003) (quoting *Town of Telluride v. Lot Thirty-Four Venture, L.L.C.*, 3 P.3d 30, 37 (Colo. 2000)).  Thus the Court may consider other appropriate factors, "including any legislative declaration as to whether a matter is of statewide concern and the need for cooperation between state and local government in order to effectuate the local government scheme."  *Id.*

I address these factors in turn.

### 1. The Need for Statewide Uniformity.

First, the Court looks at whether a statewide interest exists in the uniform regulation of sex offender residency requirements.  "Although uniformity in itself is no virtue," the Colorado Supreme Court has "found statewide uniformity necessary when it achieves and maintains specific state goals."  *Ibarra*, 62 P.3d at 160 (internal citations omitted).  "[U]niform access and expectations of consistency" are also "important factors to consider in determining whether a matter is of statewide concern."  *Id.*; *see also Telluride*, 3 P.3d at 38 (state residents have an expectation of consistency in regulations related to landlord-tenant relations).

The Colorado General Assembly has determined that the objectives of the state are best achieved through a comprehensive, evidence-based system providing for the evaluation, monitoring, treatment, and reintegration of sex offenders.  As part of that system for monitoring sex offenders and allowing them to reintegrate back into our communities, the state has the interest in assuring equal treatment of sex offenders so that they "can rely on consistent procedures and practices designed to rehabilitate them."  *Ibarra*, 62 P.3d at 161.

13

Specifically, the Court finds persuasive that a recognized state need for a standardized treatment program prompted the creation of the SOMB in Article 11.7. C.R.S. § 16-11.7-101(1). Despite no explicit declaration by the General Assembly that sex offender regulations be "uniform," the SOMB has been tasked with making statewide recommendations and guidelines on those issues, including "best practices for living arrangements for and the location of adult sex offenders within the community" and "safety issues raised by the location of sex offender residences." *Id.* § 16-11.7-103(4)(g). Additionally, the state has an interest in a comprehensive system for parole, probation, and subsequent release to achieve the goals of the state board in integrating sex offenders. *See Ibarra*, 62 P.3d at 160 (noting the forming of a similar state working group to assure uniform and consistent placement of adjudicated delinquent children to achieve the goals of the Colorado's Children's Code).

Obviously the City of Englewood has an interest in the safety issues presented by the risk of recidivism of sex offenders. However, a uniform approach to residency requirements would avoid a "patchwork approach" to the reintegration of sex offenders into society. *Cf. Ibarra*, 62 P.3d at 161 ("The state is statutorily required to avoid the patchwork approach and provide uniform treatment to adjudicated delinquent children in a manner that protects their best interests.").

2.   Extraterritorial Impact on Residents Outside the Municipality.

The Court considers "the closely related question of whether the home rule municipality's action will have any extraterritorial impact." *Telluride*, 3 P.3d 30, 38 (Colo. 2000). "An extraterritorial impact is one involving state residents outside the municipality," or is sometimes defined as "a ripple effect that impacts state residents outside the municipality."

*Ibarra*, 62 P.3d at 161.  Even a potential ripple effect may suffice.  *See Telluride*, 3 P.3d at 38

(citing *Denver & Rio Grande W. R.R. Co.*, 673 P.2d 354, 358–59 (Colo. 1983)).

Here, the Court finds that the operative result of the ordinance is to push sex offenders

into neighboring cities.  Apparently representatives of the City and County of Denver have

already complained about Englewood's policy.  Moreover, ordinances such as Englewood's can

encourage other cities to adopt similar restrictions to keep the sex offenders out.  Englewood's

quick action to bar its doors after Greenwood Village did so is an example of the domino effect

that this type of ordinance can have.[6]  As one city sees its neighboring cities adopt restrictions,

local legislatures may start "scrambling to outmaneuver each other with highly restrictive

ordinances designed to banish registered offenders from their communities."  *People v.*

*Oberlander*, 22 Misc. 3d 1124(A), 880 N.Y.S.2d 875 (N.Y. Sup. Ct. 2009).  *Cf. Webb*, 295 P.3d

at 491 (finding extraterritorial impact where "Black Hawk's ordinance may lead to other

municipal bicycle bans by local communities which, like Black Hawk, would like to favor large

transportation coaches over bicycles").

In theory, every city and county in Colorado could enact a similar "not in my backyard"

ordinance and effectively ban sex offenders like Mr. Ryals from the entire state.  As discussed

below, the concerns of particular communities are not necessarily irrational.  However, such

extraterritorial effects are contrary to the legislature's intent to rehabilitate and reintegrate sex

offenders, and they weigh in favor of this matter being one of state interest so as to avoid a

patchwork of local and state rules.  *See Webb*, 295 P.3d at 491.

---

[6] Several Colorado jurisdictions have adopted somewhat similar ordinances.  In addition to Greenwood Village, these include Castle Rock (sexually violent predators only), Lone Tree, Commerce City and Greeley.

3.   Historical and Traditional Regulation.

Third, the Court examines whether the matter at hand has been traditionally or historically regulated by the locality or the state.  *Ibarra*, 62 P.3d at 162.  The City argues that this regulation implicates the traditional home-rule regulation of land uses and other residency regulations.  However, in a challenge to an ordinance regulating sex offenders living together as applied to adjudicated delinquent children supervised by the state, the Colorado Supreme Court in *Ibarra* rejected the City of Northglenn's argument "that zoning ordinances regulating land-uses are historically and traditionally matters of local concern."  *Id.*  Courts must reject such "a 'categorical approach' and focus[] instead on 'the importance of the facts and circumstances of a particular case.'"  *Id.*

Likewise here, Englewood's categorical approach to label Ordinance 34 "as simply a 'zoning ordinance' fails to capture the sweep of this ordinance's impact" on sex offenders otherwise regulated by the state.  *Id.*  Indeed, the fact that the state legislature has developed over the last two decades a statewide scheme for regulating sex offenders demonstrates at least in recent years that there has not been a tradition in this State of exclusive regulation by local governments, if indeed there ever was.  The General Assembly's request to have the SOMB specifically research and make recommendations on best practices with respect to residency issues likewise supports the conclusion that it is at least a matter of mixed state and local concern.

4.   Constitutional Factors.

The fourth factor relevant to this Court's examination is whether the Colorado Constitution specifically commits the regulation of sex offender residency to either the city or the

state. *Webb*, 295 P.3d at 491–92.  There is no provision in the state's Constitution that relates to sex offender regulation or residency.  While it is true that the Constitution has assigned home-rule powers to Englewood pursuant to Article XX, Section 6, this provision does not specifically provide that Englewood may regulate land-use in such a manner as to determine where sex offenders may reside.  *Cf. Ibarra*, 62 P.3d at 162 ("Although the Constitution assigns home-rule powers to Northglenn pursuant to Article XX, Section 6, it does not specifically provide that Northglenn may regulate land-use in such a manner that also regulates the number of adjudicated delinquent children living in foster care homes.").

Rather, much like the adjudicated delinquent children in *Ibarra*, the legal status of sex offenders, particularly registered offenders like Mr. Ryals, "flows directly from the judicial powers granted exclusively to state courts under Article VI of the Colorado Constitution."  *Id.* Accordingly, "[b]ecause the subject matter here implicates both local and state concerns, the Constitution 'cannot be read to dictate the matter at issue as one of exclusively local concern.'" *Id.* (quoting *Commerce City*, 40 P.3d at 1283–84).

5.   Additional Factors: Cooperation and Legislative Declarations.

The Colorado Supreme Court in *Ibarra* added a fifth factor to be considered in evaluating the interest of the state, namely, the degree of cooperation between the state and the counties that is required to make the system work."  *Id.* at 162.  In that case the Court concluded that the state and municipalities can only achieve their policy goals for children adjudicated delinquent by a cooperative effort between the two.  While the state has a duty to "place them in the most appropriate setting available consistent with the needs of the child and the community," this can only be achieved "through the coordination with its state designees: the County Departments of

Social Services." *Id.* "These state designees must carry out the mandates of the social services system as they pertain to child welfare and ensure consistent and uniform application." *Id.*

Here, the state has expressed a similar duty to ensure the appropriate treatment and management of sex offenders by considering both the reintegration needs of the offender and the safety needs of the community. *See* C.R.S. §§ 16-11.7-101(1), 17-22.5-403(6), -403(8). Implementation of the CSORA, which is carried out by local law enforcement, reflects the need for cooperation between the state and the local designees who must follow the mandates of the state-level organization. 62 P.3d at 163.

Mr. Ryals is not being supervised on probation or parole. Unlike the appellee in *Ibarra*, Mr. Ryals does not challenge the ordinance only as applied to that subset of offenders under supervision whose residency would be governed by section 17-22.5-403. Rather, he challenges the applicability of Ordinance 34 to all sex offenders falling within its provisions. The Court finds that here, where the state statutes are arguably less pervasive as to the role of the state in the lives of sex offenders not under direct supervision by the state, the legislative intent to occupy the field completely is less evident.

Nonetheless, having evaluated the factors discussed above, the Court cannot conclude that this matter is "so discretely local as to supersede the state's interests." *Webb*, 295 P.3d at 492. Rather, the regulation of sex offender residency is, at least under the present pattern of state laws, a matter of mixed state and local concern. "Even if a home rule city has considerable local interests at stake, a particular issue may be characterized as 'mixed' if sufficient state interests also are implicated." *Telluride*, 3 P.3d at 37. The City has a valid interest in regulating the way that land is used in Englewood and in protecting the welfare of its residents. However, substantial state interests are implicated here, including the consistent application of statewide

laws to fulfill the goal of managing and supervising sex offenders in a way that protects the best interests of the community as a whole as well as those of sex offenders who will be re-entering the community.

Because the matter is of mixed local and state concern, the Court next examines whether a conflict exists between the ordinance and existing state law.

### B. Conflict between Local Ordinance and State Statute.

"The test to determine whether a conflict exists is whether the home-rule city's ordinance authorizes what state statute forbids, or forbids what state statute authorizes." *Webb*, 295 P.3d at 492. An ordinance may be preempted by express statutory language, or by implicit legislative intent, or where its operational effect would conflict with the application of state law. *Ibarra*, 62 P.3d at 165 (Coats, J., dissenting) (citing *Bd. of County Comm'rs v. Bowen/Edwards Assoc., Inc.*, 830 P.2d 1045, 1056–57 (Colo. 1992)).

Although "[m]ere overlap in subject matter is not sufficient to void a local ordinance," the ordinance and state law "impermissibly conflict if they 'contain either express or implied conditions which are inconsistent and irreconcilable with each other.'" *Colo. Min. Ass'n v. Bd. of Cnty. Comm'rs of Summit Cnty.*, 199 P.3d 718, 725 (Colo. 2009) (quoting *Ray v. City & Cnty. of Denver*, 121 P.2d 886, 888 (Colo. 1942)). Operational conflict can also exist "where the effectuation of a local interest would materially impede or destroy the state interest. Under such circumstances, local regulations may be partially or totally preempted to the extent that they conflict with the achievement of the state interest." *Bowen/Edwards Assoc.*, 830 P.2d at 1059.

The Court concludes that the operational effect of City of Englewood's Ordinance 34 impermissibly conflicts with the application and effectuation of the state interest in the uniform treatment, management, rehabilitation and reintegration of sex offenders during and after state

supervision.  The ordinance not only undermines the underlying policy interests that envelop the existing state regulations, but it also operationally forbids what the state scheme allows.

As indicated, the Colorado General Assembly has made clear its desire to promulgate a comprehensive system for regulating sex offenders that is based on individualized, evidence-based assessments.  *See, e.g.*, § 16-11.7-101.  The creation of the SOMB and the legislature's heavy reliance on the SOMB's recommendations and standards reflect these desires.  *See id.* § 16-11.7-109(1)(a).  It is especially telling that the legislature has tasked the SOMB with researching and making recommendations on the best practices for sex offender residency on a statewide level.  *See id.* § 16-11.7-103(4)(g).

Ordinance 34 does not feature an individualized assessment and is a blanket prohibition against residency for most "sex offenders" in virtually the entire City of Englewood.  The City argues that it has attempted to narrow the applicability of the ordinance to those sex offenders whom the state already has an interest in monitoring, for example, those with felony convictions who are required to register under CSORA.  However, despite the stated and laudable purpose of the ordinance to protect the safety of children from reoffending sex offenders, the ordinance does not consider whether the individual committed an offense against a child or whether that individual demonstrates a propensity to commit offenses against children.  *See Fross v. County of Allegheny*, 20 A.3d 1193, 1206 (Pa. 2011) (similar ordinance establishing "a blanket prohibition against residency" without considering "whether the offender's victim was a minor or the offender is determined to be a threat to minors" held to be "obstruct[ing] the operation of the statewide statutory scheme by requiring courts and the Board [of Probation and Parole] to abandon the tailored and proportionate approach of the General Assembly and attempt to devise new approaches that would satisfy the County's wider-reaching restrictions.").  Similarly, there

is no assessment of the offender's recidivism risk or of his or her rehabilitation or reintegration needs.

Nor does the ordinance consider the effect of the state's determination that the offender is appropriate for release from supervision and reintegration into the community. *See, e.g.*, *id.* § 17-22.5-403(6), -403(8) (a discharge by the state parole board is allowed "upon a determination that the offender has been sufficiently rehabilitated and reintegrated into society and can no longer benefit from parole supervision"); *id.* § 18-1.3-1001 (legislative declaration in the Lifetime Supervision Act, finding "that some sex offenders respond well to treatment and can function as safe, responsible, and contributing members of society, so long as they receive treatment and supervision").

The goals of probation and parole are to ensure that an offender is able to return to society and to assist him with that transition. *See, e.g.*, *People v. Devorss*, 277 P.3d 829, 837 (Colo. App. 2011) ("It is well established that conditions of probation serve the dual purposes of enhancing the reintegration of an offender into a responsible life style and affording society a measure of protection against recidivism."); *People v. Harper*, 111 P.3d 482, 485-86 (Colo. App. 2004) ("The purpose of parole . . . is to reintegrate offenders into society while still protecting public safety . . . . Along with a system of discretionary parole, which permits the parole board to assess the effectiveness of parole on a case-by-case basis and, thus, to require extended treatment and rehabilitation if necessary, . . . the General Assembly has adopted several other measures governing the reintegration of sex offenders into society," including the CSORA.). "Rehabilitation and reintegration depend on the creation and maintenance of a stable environment and support system, close to family ties, employment, and treatment options."

*Fross v. Cnty. of Allegheny*, 612 F. Supp. 2d 651, 658 (W.D. Pa. 2009), *aff'd and remanded*, 438 F. App'x 99 (3d Cir. 2011).

Few sex offenders are incarcerated for life.  Most will at some point return to the community, and there must be a place for them to live.  Despite the state's desire that reintegration be accomplished in a manner that addresses the needs of the offender and the community, ordinances like the Englewood ordinance pose a potentially substantial obstruction to the realization of the reintegration goals.  *See Fross*, 20 A.3d at 1207 ("Isolating all sex offenders from their communities, support systems, employment, and treatment is an approach contrary to that of the General Assembly, which requires individually tailored assessments and assistance with rehabilitation and reintegration for appropriate offenders.").

Additionally, from an operational standpoint, the ordinance conflicts with the state's system of sentencing, parole, and probation, as well as with the state's system of registration.  The blacking out of entire cities to the placement of sex offenders who remain under supervision potentially creates a substantial burden on state probation and parole officers faced with limited housing options while attempting to return sex offenders to their pre-adjudication communities or other support systems.

Further, Mr. Ryals presented evidence at trial showing that some sex offenders, when faced with the criminal sanctions in Ordinance 34, either contemplated or in fact did "go underground"—i.e., either did not register under the CSORA or registered falsely.  Detective Ball specifically noted these concerns with one sex offender, and she believed another sex offender was registered where he did not actually live.  It is entirely conceivable to the Court that a sex offender might feel that he or she has no other option when faced the impossible choice of which law to disobey, particularly if and as similar ordinances proliferate.

The City relies on the fact that the Colorado legislature considered but did not pass a sex offender residency restriction bill in 2006.   *See* H.R. 06-1089, 66th General Assembly, 2d Reg. Sess. (Colo. 2006).   However, while the House Judiciary Committee in 2006 "killed" House Bill 1089 by postponing the measure indefinitely, the inaction of the Committee could as easily speak to a disfavoring of *any* such restriction or to a disfavoring of a *statewide* restriction.   Discussion at the Committee Hearing showed that arguments were made on both sides.   The issue before the Court—whether the ordinance conflicts with state law—does not turn on one committee's discussion of a potential bill.

It is important, however, to note what the Court is not today concluding.   The Court is not declaring that the City of Englewood cannot adopt any ordinance relating to sex offender residency.   Englewood's City Council faced an immediate, real-world problem.   In effect the Parole Board had told Englewood, "we are going to place a sexually violent predator in your community, within a block of a day care center, and there is nothing you can do about it."   Faced with what it considered to be an imminent and unreasonable risk to children in the community, the City Council acted.   Unless and until the General Assembly makes it very clear the state is completely occupying the field of sex offender residency requirements, this Court is not prepared to go that far.

What the Court is concluding is that an ordinance that (1) effectively bans all felony (and many misdemeanor) sex offenders from living within its boundaries, but (2) draws no distinctions based upon the nature of the offense, the treatment the offender has received, the risk that he or she will reoffend against children, and the evaluation and recommendations of qualified state officials, is preempted.   That is a fatal combination.   A decision of a federal court holding that Englewood's statute in its present form is entirely proper could easily increase the

domino effect by motivating other municipalities to follow suit.  That is not consistent with my reading of the State's approach to this difficult issue.

### Order

For the foregoing reasons, the Court directs that final judgment be entered in favor of the plaintiff, Stephen Ryals, and against the defendant, the City of Englewood.  As the prevailing party, the plaintiff is awarded his reasonable costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 21[th] day of August, 2013.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge